UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

97 DEC 18 PM 4:45

U.S. DISTRICT COURT
N.D. OF ALABAMA

GENEVE P. HORNBUCKLE,                )
                                     )
     Plaintiff,                      )
                                     )
vs.                                  )    Civil Action No. CV96-S-2165-NE
                                     )
CRESTWOOD HOSPITAL AND               )
NURSING HOME, INC.,                  )         ENTERED
                                     )
     Defendant.                      )         DEC 1 9 1997

MEMORANDUM OPINION

Geneve P. Hornbuckle alleges Crestwood Hospital and Nursing
Home, Inc. failed to accommodate her disability and constructively
discharged her in violation of the Americans with Disabilities Act
of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq.  The action presently
is before the court on defendant's motion for summary judgment.[1]
Upon consideration of the pleadings, briefs, and evidentiary
submissions, the court concludes defendant's motion is due to be
granted.

I.  FACTS[2]

Geneve P. Hornbuckle has been disabled since age ten, when she
lost a portion of her right leg in a farming accident. (Plaintiff's
deposition at 60-62.)  She relies upon a prosthetic device to
compensate for her disability.

Defendant hired Ms. Hornbuckle as its activities coordinator
for the adult psychiatric unit in the behavioral health unit of
Crestwood Hospital during 1991.  She was responsible for planning,

---

[1]Defendant also filed a "Motion to Strike Portions of Plaintiff's Brief in
Opposition to Summary Judgment." That motion to strike is denied, although the
discrepancies between plaintiff's argument and evidence are noted by the court.

[2]Plaintiff elected to omit a statement of facts from her materials in
opposition to summary judgment. As a result, defendant's statement of facts is
largely unrebutted.

coordinating, and implementing therapeutic activities for psychiatric patients. (*Id.* at 127-28.) Ms. Hornbuckle performed an initial assessment of each patient upon admission, determined group activities in which the patient could safely participate, and planned each patient's weekly participation. (*Id.* at 145-47.) She supervised social outings (such as visiting shopping malls and museums) and physical exercises (such as bowling, basketball games, and walks in local parks). (*Id.* at 149-51.) She also assisted patients with arts and crafts, and occasionally helped with the preparation of meals. (*Id.* at 148-55.)

Defendant conducted an evaluation of its staffing requirements in July of 1993, and concluded that some full-time positions should be converted to part-time. (Hale affidavit ¶ 5.) Plaintiff's position was among those; it was slated to be reduced to eight hours a week. (*Id.* ¶ 6.) Upon learning of that decision, Ms. Hornbuckle asked director of nursing Margaret Hale to retain her as a full-time employee. (Plaintiff's deposition at 471; Hale affidavit ¶ 7.) The following day, plaintiff's supervisor, Mary Ann Laverty, informed Ms. Hornbuckle that the hospital would retain her as a full-time employee if she agreed to become activities coordinator for two units of "New Start" patients: the adolescent unit; and, the drug and alcohol unit. Plaintiff accepted the offer. (Hale affidavit ¶ 8; plaintiff's deposition 228-29.) Thereafter, the physical requirements of her position remained essentially the same. She nevertheless was required to walk more, because of an increase in the number of patients supervised. (Plaintiff's deposition at 187-88.)

2

Later that same year, Ms. Hornbuckle asked to be allowed off work every other Monday. (Wright deposition at 104.) Defendant accommodated that request. Plaintiff thus worked fewer hours each bi-weekly pay period (72 rather than 80) for the remainder of her term of employment.

Ms. Hornbuckle began treatment during 1994 for back problems and scoliosis complicated by her prosthesis. (Plaintiff's deposition exhibit 1.) She presented director of nursing Margaret Hale a letter from an orthopedic surgeon on June 23, 1994. The physician recommended that Ms. Hornbuckle avoid prolonged walking (over one half mile at a time), refrain from bowling with patients, and engage in "basketball very cautiously." (*Id.*) In response, defendant allowed plaintiff to participate in bowling and basketball at her discretion, and did not require her to do more than supervise those activities. (*Id.* at 199, 206.) Plaintiff now admits that the walking limitation was not a significant issue, because her duties did not require that she walk more than one half mile at a time. (*Id.* at 199-202.)

Ms. Hornbuckle presented another letter from her physician on August 18, 1994, requesting that she be excused from participation in a CPR recertification course because of continuing back pain. (*Id.* exhibit 2.) Defendant agreed. (*Id.* at 205-07.)

Near the end of 1994, Crestwood Hospital administrators began the process of preparing for a March 1995 triennial inspection by the Joint Commission on Accreditation of Health Care Organizations ("JCAHCO"). (Wright affidavit ¶ 4.) Readiness was critical: failure to achieve JCAHCO accreditation amounted to "a virtual

3

death sentence for any hospital entity." (*Id.*)   Among other
consequences, the hospital would be ineligible for Medicare
reimbursements.  Hospital administrators consequently searched for
(and took steps to correct) deficiencies in the level of care
provided to patients.   (Wright deposition at 77-78; Wright
affidavit ¶ 5.)   That probe disclosed shortcomings in plaintiff's
administration of her programs.  She scheduled too few activities,
and her records and documentation did not comply with JCAHCO
requirements.  (Wright deposition at 77-78.)

Defendant's director of behavioral health sciences, Roger
Hunter, and various unit managers consequently met with Ms.
Hornbuckle on November 10, 1994.  The discussion focused on three
areas of concern:

(1)   little to no outside activities were taking place
with the Adult Psychiatric and New Start units;

(2)   no structure was in place for continuity of the
activity program on occasions when plaintiff was
absent; and,

(3)   planned activities were canceled when only a few
patients were available, and no alternative
activities were substituted.

(Plaintiff's deposition exhibit 13.)  Plaintiff was given a "work
improvement plan" which emphasized that all units should receive
daily exercise, and that each patient should participate in a group
outing at least twice a week.  (*Id.* exhibit 14.)

Sometime thereafter in late 1994, plaintiff requested that
defendant allow psychiatric technicians to occasionally perform her
duty of accompanying patients on group walks around the hospital.
(*Id.* at 263-68.)  Defendant agreed.  (*Id.* at 268.)  Defendant took
other steps to assist plaintiff.  She requested assistance with

4

moving tables and carrying water required for cooking and cleaning in her activity room. Defendant accommodated that request by making psychiatric technicians available to perform the physical labor, and by installing a sink in her activities room. (*Id.* at 282-83, 324, 427-28.)

Plaintiff again met with director of behavioral health sciences Roger Hunter in January of 1995, to review her implementation of the November 1994 work improvement plan. (*Id.* at 385-86.) As a result of that meeting, plaintiff received a second, more detailed, work improvement plan which reiterated the necessity of regular outings and exercise for patients in each unit, and for timely documentation of activities as required by JCAHCO. (*Id.* at 256-62, exhibit 15.)

On February 3, 1995, plaintiff submitted resignation letters to human resources director Charles Wright, and, director of behavioral health sciences Roger Hunter. (*Id.* exhibit 16.) Plaintiff wrote that "restructured job changes" imposed physical hardships, and she no longer could perform her duties. (*Id.*) Plaintiff later testified, however, that the only "restructured job changes" were "increased" trips to the gym.[3] Plaintiff's gave two weeks notice, and stated that her last day of employment would be February 17, 1995. (*Id.* exhibit 16.)

When Ms. Hornbuckle delivered her resignation letter to human resources director Charles Wright, they discussed the reasons for her decision. (Wright deposition at 85-86.) During that conversation she requested, for the first time, that the hospital

[3]Defendant notes that there was no true "increase," because plaintiff had been responsible for taking all of her units to the gym since July of 1993. (Defendant's brief at 12 n.14.)

5

hire a "personal assistant" to perform the physical aspects of her job. (Plaintiff's deposition at 472-73.) Plaintiff gave the following deposition testimony about the functions she desired her proposed assistant to perform:

> Q. If you had had extra help, if you had had additional personnel assisting you or working under you, how would that have helped with these so-called restructured job changes?
>
> A. They probably could have taken some of the groups to the gym instead of me going; and then I could have spent time doing my assessments, or doing planning.
>
> Q. You could have done the desk work, the paperwork part of the job; and this assistant could have done the walking and driving to the gym part of the job?
>
> A. Yes, sir.
>
> Q. Is that what you were requesting of the hospital?
>
> A. Yes, sir.

(*Id.* at 397-98.) In addition to her request for a personal assistant, plaintiff told Wright that she had experienced difficulty in moving a videocassette recorder between floors of the hospital, and moving furniture and equipment in her activities room. (Wright deposition at 87-89.)

Wright agreed to consider plaintiff's requests. He first met with director of nursing Margaret Hale and director of behavioral health sciences Roger Hunter. (*Id.* at 87-88.) Thereafter, on February 22, 1995, Wright, Hunter, and plaintiff met to discuss potential accommodations. Wright told plaintiff that an assistant could not be hired. (*Id.* at 88.) He proposed, instead, that plaintiff resume working a full 80 hour bi-weekly pay period, to have more time to perform her job functions. (Wright affidavit ¶ 10.) He agreed to permanently install a videocassette recorder in

6

plaintiff's activity room, so she no longer would be required to move one between floors. He also promised to instruct all employees working near the activities room to assist with movement of furniture and equipment. (Wright deposition at 89-90.) Finally, he offered to have plaintiff's position evaluated by the hospital's physical therapy department and the State of Alabama Department of Rehabilitation, for additional recommendations to ease plaintiff's burdens. (*Id.* at 90.) Plaintiff responded that she did not believe she could continue to perform her job without a personal assistant, and she was unwilling to attempt to do so with defendant's proposed accommodations. (Wright affidavit ¶ 11.) Wright reiterated that the hospital could not hire an assistant. The reasons for that are stated in his affidavit as follows:

> 7. In late 1994, it was common knowledge that the Hospital was for sale. Between that date and April 1995, ... the numbers on the Hospital's census, which tabulates the number of patients on a daily basis (both impatient [sic] and outpatient), began to drop in that time frame.

> 8. When the census numbers initially began to decline, the number of staff employees remained constant, which led to a high FTE (full time equivalent) ratio of staff to patients. A high FTE ratio is a concern because, from a budgetary standpoint, it is difficult to justify so many staff members for a declining number of patients. Therefore, during that time frame, whenever employees would resign or otherwise end their employment, the Hospital was not hiring replacements except in those positions where it was absolutely necessary. The Hospital was in a downsizing mode throughout late 1994 and early 1995. In fact, there were two rather severe reductions in force in the first half of 1995.

> 9. After Ms. Hornbuckle, on or around February 3, 1995, submitted her resignation letter and requested that the Hospital hire her an assistant, I discussed her request with Roger Hunter and Margaret Hale. They informed me that, based upon the FTE ratio, combined with the concerns relating

7

> to the purchase of the Hospital, the Hospital could not justify hiring another employee, whether full-time or part-time, to assist in the performance of the Activities Coordinator position. They decided that the Activities Coordinator position only justified one full-time equivalent (i.e. 40 hours per week) employee. It was irrational to even consider hiring an additional part-time or full-time employee to perform a one position job while simultaneously trying to locate employees who could be expendable in an effort to reduce the staffing level at the Hospital.

Defendant did not hire a replacement activities coordinator following plaintiff's resignation. (Wright deposition at 158-61.) Instead, her duties were assigned to independent contractors or spread among other employees. (*Id.* at 159-62; Wright affidavit ¶ 14.)

## II. DISCUSSION

### A. ADA Analysis

Plaintiff bears the burden of proving that defendant discriminated against her because of a disability. That can be done either by direct or circumstantial evidence. When plaintiff's evidence is circumstantial in nature, as is the case here, the Supreme Court has imposed a three part test for focusing the inquiry into the employer's motivation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[4]

---

[4]Although the Eleventh Circuit has not explicitly held to the following effect, it nevertheless is widely agreed that the burden-shifting analysis expressed in *McDonnell Douglas* and its progeny, and applied in Title VII cases, should be followed in deciding cases brought under the ADA. *See, e.g*, Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996), *cert. denied*, __ U.S. __, 117 S.Ct. 964 (1997)(implicitly using burden-shifting framework);

**8**

First, plaintiff must establish a *prima facie* case, which under the ADA requires proof that: (1) she has a disability; (2) she is a "qualified individual"[5] (*i.e.*, that she can perform the essential functions of the job position that she holds or seeks, with or without reasonable accommodation being made by the employer); and (3) she was subjected to unlawful discrimination (*i.e.*, suffered an adverse employment action) because of her disability. *E.g., Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224 (11th Cir. 1997); *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (citing *Pritchard v. Southern Company Services,* 92 F.3d 1130, 1132 (11th Cir. 1996), and *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)). If plaintiff establishes a *prima facie* case, then at the second stage of analysis the burden of production shifts to defendant to rebut the presumption of intentional discrimination thus created by articulating legitimate, nondiscriminatory reasons for the employment action. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If defendant does so, then in the final step of the inquiry plaintiff must have an opportunity to demonstrate that defendant's stated reasons merely are pretexts for

---

McNemar v. The Disney Store, Inc., 91 F.3d 610, 619 (3d Cir. 1996), *cert. denied*, __ U.S. __, 117 S.Ct. 958 (1997); Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 761 n.2 (5th Cir. 1996), *cert. denied*, __ U.S. __, 117 S.Ct. 958 (1997); *see also* Johnson v. Boardman Petroleum, Inc. 923 F. Supp. 1563 (S.D. Ga. 1996); Lewis v. Zilog, Inc., 908 F. Supp. 931 (N.D. Ga. 1995).

[5]42 U.S.C. § 12111(8) (defining the term "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). *See also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

unlawful, discriminatory motives.  *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

**B.   Qualified Individual with a Disability**

Defendant argues that plaintiff cannot fulfill the second element of her *prima facie* case (*i.e.*, that she is a qualified individual with a disability), because she cannot identify any reasonable accommodation that would allow her to perform the essential functions of her job.   At the *prima facie* stage, plaintiff bears the "burden of producing probative evidence that reasonable accommodations were available."   *Moses v. American NonWovens, Inc.*, 97 F.3d 446, 448 (11th Cir. 1996).

**1.   Essential functions of the activities coordinator position**

The parties agree that the activities coordinator position basically required plaintiff to plan, coordinate, and implement group activities. (Plaintiff's brief at 3; Defendant's brief at 18-19.)  Plaintiff offers no other evidence of the essential functions of her position, while defendant presents evidence that other functions were implicit in each of the three basic duties. Specifically, defendant's human resources manager, Charlie Wright, testified by affidavit that:

> The most critical aspect of the Activities Coordinator position was the actual implementation of the planned activities by overseeing and supervising patient outings, exercise and activities.  We were required in order to maintain our accreditation to ensure that our patients were engaging in a certain amount of exercise and activity therapy.  The planning of these activities was secondary and simply a means to accomplish the essential element of this job which was to oversee patients' participation in therapeutic activities and outings.

10

(Wright affidavit ¶ 3.)    The written description of plaintiff's
position records that it entailed "50% walking and 50% sitting."
(Plaintiff's deposition exhibit 10.)    One of plaintiff's stated
reasons for resigning was that "she couldn't keep up the walking
required for her job." (*Id.* exhibit 4.)    Plaintiff elaborated the
physical requirements of "implement[ing] group activities" during
her deposition:

> Okay.  When I first went to work there[6], I had, maybe,
> one walk a day on the adult psyche unit; and I had arts
> and crafts, which consisted of taking arts and crafts and
> setting them up.  I usually had to rearrange a room,
> because I did not have a room when I first started,
> except the leisure room, I believe is what they called
> it.  And I also had the meal prep, which I had to go down
> and get, which consisted of loading food on a cart and
> pushing it back up.  I had the outing, which consisted of
> gathering the patients up, encouraging the patient to go
> on the outing, walking them down to the van, and then
> driving them to where they needed to go, and then being
> with them somewhat where we went.  That was the physical
> part.

(*Id.* at 179-80.)

The ADA's implementing regulations state that a job function
"may be essential because the reason the position exists is to
perform that function." 29 C.F.R. § 1630.2(n)(2)(1).    Based upon
the foregoing evidence, this court concludes that the activity
coordinator position exists, in part, to perform the function of
walking for fifty percent of the work day, while overseeing and
supervising patient participation in outings, exercise, and other
group activities.  Defendant contends plaintiff could not perform
that function even with <u>reasonable</u> accommodation.

---

[6]Plaintiff testified that the amount of walking and the number of group
outings increased when she assumed supervision of the adolescent unit and the
drug and alcohol unit in 1994. (Plaintiff's deposition at 187-88, 192.)

11

## 2. Plaintiff's requested accommodation: a part-time assistant

Plaintiff testified that the <u>minimum</u> accommodation which would allow her to perform the essential functions of her job was "[t]o have some assistance." (Plaintiff's deposition at 500.) The "assistance" she requested was the employment of a part-time assistant, an accommodation that defendant was unwilling to make. (Plaintiff's deposition at 439-47, 453-55, 492-93.) Thus, plaintiff can fulfill her *prima facie* burden only by producing evidence that her request for a personal assistant was a <u>reasonable</u> accommodation.

### a. Hours plaintiff desired assistant to work

All of plaintiff's arguments on the reasonableness of her request focus on her unsubstantiated claim that she only sought "a part-time employee to assist her on the basis of <u>eight hours or less every two weeks</u>." (Plaintiff's brief at 6 (emphasis supplied).) Defendant challenges that argument with evidence that plaintiff <u>actually</u> requested the employment of an assistant who would work for half of each week. Plaintiff testified during her deposition as follows:

> Q. Can you remember any specifics of what Mr. Wright asked you or what you told him, or what you all discussed in that follow up meeting, in other words the follow up meeting after you gave him your resignation?
>
> A. I believe that's when he asked me about what accommodation that I felt like I could benefit from, I believe. I'm not sure.
>
> Q. What did you tell him?
>
> A. That I felt like that if I had someone to help me out, <u>and I stated three days a week or four hours a day</u>.

12

(Plaintiff's deposition at 454-55 (emphasis supplied).) Plaintiff

worked only nine days every two weeks; therefore, she was

requesting an assistant for 36 to 48 hours of her 72 hour pay

period.

### b. Functions plaintiff desired assistant to perform

Plaintiff argues that her request for part-time assistance was

reasonable, because she was seeking "reallocation or redistribution

of non-essential, marginal job functions." (Plaintiff's brief at

5-6 (emphasis supplied).)    This court finds the functions

plaintiff contemplated her assistant performing were essential,

rather than marginal:

> Q.   If you had had extra help, if you had had additional
>      personnel assisting you or working under you, how would
>      that have helped with these so-called restructured job
>      changes?
>
> A.   They probably could have taken some of the groups to the
>      gym instead of me going; and then I could have spent time
>      doing my assessments, or doing planning.
>
> Q.   You could have done the desk work, the paperwork part of
>      the job; and this assistant could have done the walking
>      and driving to the gym part of the job?
>
> A.   Yes, sir.
>
> Q.   Is that what you were requesting of the hospital?
>
> Q.   Yes, sir.

(Plaintiff's deposition at 397-98 (emphasis supplied).)

### 3. Reasonableness of plaintiff's requested accommodation

Plaintiff's request for an assistant to perform "the walking

and driving to the gym part of the job" would have required

defendant to hire an additional employee, and, to reallocate

essential functions of the activity coordinator position to that

employee. However, the ADA neither requires an employer to

13

reallocate the essential functions of a position as a reasonable accommodation (29 C.F.R.  1630 App. § 1630.2(o); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527-28 (11th Cir. 1997)), nor to hire an additional employee to perform the essential functions of a job for a disabled individual. *See, e.g., Martinson v. Kinney Shoe Corporation*, 104 F.3d 683, 687 (4th Cir. 1997)("The ADA simply does not require an employer to hire an additional person to perform an essential function of a disabled employee's position"); *Krennerich v. Inhabitants of the Town of Bristol*, 943 F. Supp. 1345, 1351-52 (D. Me. 1996); *Ricks v. Xerox Corporation*, 877 F. Supp. 1468, 1477 (D. Kan. 1995). Therefore, this court finds there is no evidence that a <u>reasonable</u> accommodation existed which would allow plaintiff to perform the essential functions of the job she held. Consequently, plaintiff was not a "qualified individual with a disability," she cannot demonstrate a *prima facie* case, and summary judgment is appropriate.

### 4. Plaintiff's arguments that her accommodation was reasonable

#### a. Estoppel

Plaintiff argues that defendant is estopped from challenging the reasonableness of her requested accommodation. To establish an estoppel, plaintiff must demonstrate inconsistency in defendant's position. *See DeShong v. Seaboard Coast Line Railroad Co.*, 737 F.2d 1520, 1522 (11th Cir. 1984). She failed to do so.

#### b. Assignment of other employees to assist plaintiff

Plaintiff argues that the request for an assistant was reasonable, because defendant employed persons who could easily fulfill the assistant position. At the time of her termination,

14

defendant employed approximately sixty to eighty "PRN's"[7] (temporary employees who worked up to sixteen hours each week). (Wright deposition at 134-36.) Plaintiff also notes that psychiatric technicians assisted her with walking patients, lifting, and moving furniture. Thus, she contends that it would be reasonable to permanently assign a "PRN" or a psychiatric technician to assist her. (Plaintiff's brief at 6-7.) Plaintiff's "permanent assignment" argument, however, is equivalent to requesting that defendant hire an employee to work half of plaintiff's work week, performing the physical aspects of her job. As discussed above, defendant was not required to reallocate the essential functions of plaintiff's position to another employee, and summary judgment is appropriate.

### c. Defendant's alleged failure to follow procedures

Plaintiff also argues that defendant did not follow its own procedures in attempting to ascertain an accommodation for her. (Plaintiff's brief at 7-8.) That argument has no relevance to a determination of the reasonableness of plaintiff's request for an assistant. Even if there is some relevance, the court has reviewed plaintiff's evidence and finds that defendant adequately followed its procedures. (Wright deposition 118-21, 123-24.) Nevertheless, even if defendant completely abandoned its procedures for determining accommodations, the burden still would rest with plaintiff to demonstrate that a reasonable accommodation existed. In *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996), the Eleventh Circuit stated:

---

[7]"PRN" is an abbreviation used by physicians for the term "as needed." (Wright deposition at 134-35.)

> Moses's primary arguments are that American failed to
> investigate his condition and failed to consider possible
> accommodations.  Neither is persuasive.  We are persuaded
> that American's failure to investigate did not relieve
> Moses of his burden of producing probative evidence that
> reasonable accommodations were available.

Thus, defendant was not required to perform an investigation for

potential accommodations for plaintiff; its failure to do so

creates no genuine issue of material fact; and, summary judgment is

appropriate.

## C.   Failure to Accommodate

Even if plaintiff were considered a qualified individual with

a disability, defendant has demonstrated she has no claim for

failure to accommodate.  During her tenure, defendant agreed to

each request for accommodation, except plaintiff's request for a

personal assistant.  Defendant offered alternative accommodations

to address plaintiff's concerns: e.g., a VCR would be permanently

installed in plaintiff's activity room; and, defendant would have

plaintiff's position evaluated by a physical therapist or a state

rehabilitation specialist to recommend other ways she could be

assisted in performing her job.  (Plaintiff's deposition exhibit

5.)   Plaintiff rejected those suggested accommodations without

explanation, demanding a personal assistant.  (Wright affidavit ¶

12.)

Defendant thus argues that "[b]ecause Plaintiff declined to

avail herself of the accommodations the Hospital made available to

her (even on a trial basis), she is precluded from arguing that

another   favored   accommodation   should   have   been   provided."

16

(Defendant's brief at 34.)[8]  The Eleventh Circuit recently said in
that regard:

> Liability simply cannot arise under the ADA when an
> employer does not obstruct an informal interactive
> process; makes reasonable efforts to communicate with the
> employee and provide accommodations based on the
> information it possesses; and the employee's actions
> cause a breakdown in the interactive process.

*Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117 F.3d 1278, 1286
(11th Cir. 1997).[9]  In the present action, defendant engaged in the
interactive accommodation process envisioned by the ADA, and made
reasonable efforts to communicate with Ms. Hornbuckle regarding
accommodations.  Plaintiff's rejection of defendant's proposals
caused a "breakdown in the interactive process" for which defendant
cannot be held responsible.

**D.  Constructive Discharge**

Plaintiff contends her resignation amounted to a constructive
discharge, because defendant allegedly restructured her job and
thereby increased the amount of physical labor required.
(Plaintiff's brief at 8-9.)  To prove constructive discharge,
plaintiff must establish her working conditions were so intolerable
that a reasonable person in her position would feel compelled to

---

[8]Plaintiff offers no opposition to defendant's argument, and summary
judgment is proper on that ground. *See* Brewer v. Purvis, 816 F. Supp. 1560, 1579
(M.D. Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995)("Summary judgment is
appropriate since Plaintiff failed to respond to [defendant's] argument on this
issue"); *see also* Wiley v. Earl's Pawn & Jewelry, Inc., 950 F. Supp. 1108, 1113
n.4 (S.D. Ala. 1997); Southern Nevada Shell Dealers Association v. Shell Oil, 725
F. Supp. 1104, 1109 (D. Nev. 1989).

[9]The facts of *Stewart* are more extreme than those in the present action,
but the reasoning remains applicable. In that case, an employee requested an
accommodation of a thirty minute lunch break. Defendant refused, but offered
five other accommodations. Without explanation, plaintiff refused to accept any
of those accommodations, and then demanded a thirty minute lunch break for all
employees.

17

resign. *Kilgore v. Thompson & Brock Management*, 93 F.3d 752, 754

(11th Cir. 1997). Defendant argues that:

> Plaintiff never even tried the Hospital's offered accommodations to determine, on the job, whether they adequately accommodated her disability. They might have allowed her to perform the job and perform it with relative ease. Plaintiff's decision to resign was based on her unwillingness to work with the Hospital in accommodating her disability, not based on intolerable conditions imposed by the Hospital. Plaintiff's failure to even briefly attempt to perform her job with the accommodation offered by the Hospital is patently unreasonable and completely undermines Plaintiff's claims that her work conditions were so intolerable that a reasonable person in her position would be compelled to resign.

(Defendant's brief at 41-42.)

In deciding a constructive discharge claim arising from an allegation of Title VII gender discrimination, the Eleventh Circuit has held:

> A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation. None of the plaintiffs returned to work after complaining to corporate management. Summary judgment on the constructive discharge claim was appropriate; the plaintiffs did not allow sufficient time for [defendant] to correct the situation.

*Kilgore*, 93 F.3d at 754. The court believes that reasoning applies to the present action. Plaintiff did not give defendant a sufficient opportunity to remedy the alleged burdens placed on her by the physical requirements of her job. Rather than attempting to work with defendant's proposed accommodations, plaintiff insisted on a personal assistant, which defendant was unwilling to provide. Plaintiff's resignation was not caused by any action of defendant, but by her unrelenting insistence that a personal assistant was the only accommodation that would allow her to perform her job.

18

### III.   CONCLUSION

For the foregoing reasons, the court concludes that defendant is entitled to summary judgment on each of plaintiff's claims.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this the __18th__ day of December, 1997.

United States District Judge